IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THEARA YEM,<br><br>               Petitioner,<br><br>vs.<br><br>FRED FOULK, Acting Warden, High<br>Desert State Prison,<br><br>               Respondent. | No. 2:13-cv-00950-JKS<br><br>MEMORANDUM DECISION |

Theara Yem, a state prisoner represented by counsel, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Yem is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at High Desert State Prison. Respondent has answered, and Yem has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On October 5, 2009, a jury convicted Yem of the second degree murder of Kevin Nhep and also found true the special allegations that Yem personally and intentionally discharged a firearm causing death and that the murder promoted conduct by criminal street gang members. The jury also found Yem guilty of shooting at an occupied motor vehicle for the benefit of a criminal street gang and active participation in a criminal street gang.

With respect to the second degree murder conviction, the trial court sentenced Yem to an imprisonment term of 15 years to life plus 25 years to life on the firearm enhancement and 10 years to life on the gang enhancement. The trial court sentenced Yem to a consecutive imprisonment term of 15 years to life on the shooting at an occupied motor vehicle conviction plus 25 years on the firearm enhancement attached to that conviction. The court also sentenced

Yem to a concurrent term of 2 years on the active participation in a criminal street gang

conviction for a total imprisonment term of 90 years to life.

On direct appeal, the California Court of Appeal recounted the following facts underlying

Yem's conviction:

> Most of the percipient witnesses to the shooting lied to the police during the
> initial investigation and were affiliated with different gangs, whether they were validated
> members or not. They all, including [Yem], told the jury the same basic chronology of
> events, the details and various discrepancies of which are irrelevant to the issues before
> us. Because [Yem] admitted at trial that he shot Nhep and kept on shooting until his gun
> was empty, we begin with a synopsis of his testimony. The only issue before the jurors
> was whether they believed he had acted in self-defense.
>
> [Yem] testified he spent several nights a week with Chantha Bun, a leader of the
> Tiny Raskal Gang (TRG), because Bun lived closer to where [Yem] worked. Although
> his social life revolved around TRG and he was photographed with gang members giving
> gang signs, he told the jury he was not a member of a gang and the signs were
> neighborhood signs, not gang signs. The events on the night of August 17, 2006, would
> suggest otherwise, even according to [Yem's] own telling of the story.
>
> On that summer night, he was hanging out with Bun and other TRG members at
> Bun's house. [Yem], as was his custom, was armed with a nine-millimeter gun.
> Although it is unclear if he had it with him in the car, [Yem] had borrowed an Uzi. Bun
> and his girlfriend left to buy beer, cigarettes, and snacks at the Discount Liquor Store
> located two blocks from Bun's house. They returned, however, without the cigarettes.
> [Yem] and Bun went back to the liquor store in [Yem's] black Honda to get the
> cigarettes. Only [Yem] went inside.
>
> Near the counter, [Yem] encountered David Suon, a former member of the Oak
> Town Crips from Oakland. Suon asked, "What's up, 'cuz?" and [Yem] responded,
> "What's up?" [Yem] did not feel threatened and he bought his cigarettes without
> incident.
>
> But when he left the store, he saw Nhep standing by the side of a red Honda with
> several other Cambodians inside the car. Nhep had his hands inside his pants and was
> staring at him. He asked Nhep, "Do you have a problem?" and Nhep repeated the
> inquiry, "Do you have a problem?" [Yem] lifted up his shirt to show Nhep his gun,
> hoping that Nhep would back off. He was scared and thought Nhep would shoot him.
> [Yem] pulled out his gun and "just shot." He kept on shooting until the magazine was
> empty, but he testified he did not intend to hit any of the people in the car.
>
> Bun drove up in [Yem's] car and they fled the scene. [Yem] threw away the gun
> and hid his car. He showered to remove the gunshot residue and drank beer with TRG
> members. The next day he went to work, collected his wages, tried to borrow money
> from a coworker, and returned to Antioch, where he lived with family members. When
> later apprehended, he lied to the police. Although he told the police initially he was not

the shooter, he testified the group of people did not display a gun and he admitted he was the shooter.

Nhep's five friends gave similar accounts of the events leading up to the shooting, with minor discrepancies. They all agreed that no one in their group had thrown any gang signs, no one was armed, and no one verbally challenged [Yem]. They denied "mean mugging" him, that is, staring at him in a threatening or menacing manner. According to a few in the group, Nhep was holding a cell phone. After they saw [Yem's] gun, they unsuccessfully encouraged Nhep to get back into the car. One of them yelled to [Yem], "Hey, we got no problem." They saw [Yem] shoot Nhep. One of the girls was shot in the buttocks, another in the leg.

A gang expert testified to the sociology and psychology of gang members, particularly the Asian gangs operating in Stockton. He familiarized the jury with the leadership structure, customs and practices, and members identified with TRG, including the fact that because they claim "EBK" (everybody killer), they do not claim Blood or Crip gangs and will shoot anybody. The expert opined that [Yem] was an active member and committed the instant offenses for the benefit of the gang. He described the two predicate offenses committed by TRG members to satisfy the elements of the gang enhancements. [Yem] does not challenge the expert's testimony on appeal.

Through counsel, Yem appealed his conviction to the Court of Appeal, arguing that:

1) the trial court erred in admitting as a prior inconsistent statement the police statement of a witness who testified at trial; 2) the trial court erred in precluding defense counsel from cross-examining a prosecution witness about her prior juvenile adjudication for robbery; 3) the evidence was insufficient to sustain the jury's verdicts on the second degree murder and shooting at an occupied vehicle charges; 4) the trial court erred under *Batson v. Kentucky*, 476 U.S. 79 (1986), when it failed to find a *prima facie* case of discrimination after the prosecution peremptorily challenged an African American juror; and 5) the trial court erred when it sentenced Yem to a consecutive 10-year term on the gang enhancement to the murder conviction. Appellant's Opening Brief at i-iii. In a reasoned opinion, the appellate court struck the 10-year term imposed upon the gang enhancement but otherwise affirmed the judgment in its entirety. Yem, again proceeding through counsel, then raised the unsuccessful claims to the

California Supreme Court in his application seeking leave to appeal.  The supreme court denied the application without comment on August 15, 2012.

Yem timely filed a Petition for a Writ of Habeas Corpus to this Court on May 14, 2013.

## II. GROUNDS/CLAIMS

In his counseled Petition, Yem asserts the four claims he unsuccessfully raised on direct appeal.  First, he argues that his convictions for second degree murder and shooting at an occupied motor vehicle are unsupported by legally sufficient evidence.  He next contends that his Sixth Amendment right to confrontation was violated when the trial court precluded him from cross-examining a prosecution witness with a prior juvenile adjudication for robbery by force or fear.  He likewise claims that his rights to due process and a fair trial were violated when the trial court admitted as a prior inconsistent statement the statement to the police of an eyewitness who testified at trial.  Finally, Yem argues that the trial court erred in denying his *Batson* motion.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under the AEDPA, the state court's

5

findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

### Claim 1.  Insufficiency of the Evidence

Yem first argues that his convictions are unsupported by legally sufficient evidence. Yem contends that "[t]he evidence here was insufficient to establish anything more than a voluntary manslaughter," because the evidence established a "hostile exchange" between Yem and the victim such that Yem "believed either reasonably or unreasonably that Nhep was a threat to him."

As an initial matter, Yem contends that AEDPA deference is not required here because the California Court of Appeal applied the California standard, articulated in *People v. Johnson*, 606 P.2d 738 (Cal. 1980), rather than *Jackson v. Virginia*, 443 U.S. 307 (1979), the federal constitutional standard for sufficiency of the evidence.  According to Yem, "[t]he *Johnson* standard is different from the *Jackson* standard, requiring only a reasonable as opposed to a rational jury."  *Id.*  But Yem has found no cases distinguishing between the *Johnson* and *Jackson* standards.  Rather, the Ninth Circuit has cited both *Jackson* and *Johnson* when discussing the proper standard for reviewing sufficiency of the evidence claims, *see Ngo v. Giurbino*, 651 F.3d 1112, 1115 (9th Cir. 2011), and thus it appears that "reasonable" and "rational" are synonyms here.  Moreover, the Ninth Circuit has stated in unpublished opinions that the California *Johnson* standard is identical to the federal standard of review for sufficiency of the evidence.  *See Smart v. Hedgpeth*, 476 F. App'x 803, 803 (9th Cir. 2012); *Casey v. Martel*, 468 F. App'x 671, 673 n.1

6

(9th Cir. 2012).  The California Supreme Court has said the same.  *See Johnson*, 606 P.2d at 750

(noting that "California decisions state an identical standard" to *Jackson*).  In addition, a state

court's failure to cite governing Supreme Court authority does not affect the application of the

AEDPA standard so long as the state court's ruling does not contradict the Supreme Court's

decisions.  *Casey*, 468 F. App'x at 673 n.1.

      This Court must therefore determine whether the California court unreasonably applied

*Jackson*.  As articulated by the Supreme Court in *Jackson*, the constitutional standard for

sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to

the prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319 (emphasis in the original); *see also*

*McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).  In determining

whether the California court unreasonably applied *Jackson*, this Court may not usurp the role of

the finder of fact by considering how it would have resolved any conflicts in the evidence, made

the inferences, or considered the evidence at trial.  *Jackson*, 443 U.S. at 318-19.  Rather, when

"faced with a record of historical facts that supports conflicting inferences," this Court "must

presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any

such conflicts in favor of the prosecution, and defer to that resolution."  *Id.* at 326.

      It is a fundamental precept of dual federalism that the States possess primary authority

for defining and enforcing the criminal law.  *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).

Consequently, although the sufficiency of the evidence review by this Court is grounded in the

Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set

forth in state law.  *Jackson*, 443 U.S. at 324 n.16.  This Court must also be ever mindful of the

deference owed to the trier of fact and the sharply limited nature of constitutional sufficiency review.  *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005).  A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").  It is through this lens that this Court must view an insufficiency of the evidence claim.

Under California law, a jury may convict a defendant of voluntary manslaughter when a killing occurs "under the actual but unreasonable belief that the killer was [in] imminent danger of death or great bodily injury."  *People v. Booker*, 245 P.3d 366, 400 (Cal. 2011); *see also People v. Barton*, 906 P.2d 531, 539 (Cal. 1995) (defining "unreasonable self-defense" as when "the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense").  Such a killing "obviates malice" because the required mental state cannot "coexist" with defendant's "actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand."  *People v. Rios*, 2 P.3d 1066, 1074 (Cal. 2000).  When substantial evidence that a defendant killed in "unreasonable self-defense" has been presented, the prosecution has the burden of proving beyond a reasonable doubt the absence of imperfect self defense in order for the jury to find the malice element required for murder.  *See Barton*, 906 P.2d at 577; *Rios*, 2 P.3d at 1074.  However, in order to reduce murder to voluntary manslaughter under a theory of imperfect self defense, there must be evidence from which the jury reasonably could find that petitioner "actually believe[d] in the need to defend himself

against imminent peril to life or great bodily injury." *See People v. Viramontes*, 115 Cal. Rptr.

2d 229, 232 (Cal. Ct. App. 2001).

In this case, the jury was instructed on imperfect self defense:

> Voluntary manslaughter, imperfect self-defense.  A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense.  If you conclude that the defendant acted in complete self-defense, his action was lawful, and you must find him not guilty of any crime.
>
> The differen[ce] between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable.  The defendant acted in imperfect self defense if: One, the defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury;
>
> And, two, the defendant actually believed that the immediate use of deadly force was necessary to defend against danger;
>
> But, three, at least one of those beliefs was unreasonable.
>
> Belief in future harm is not sufficient, no matter how great, or how likely the harm is believed to be.
>
> In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.
>
> Great bodily injury means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm.
>
> The People have the burden of proving, beyond a reasonable doubt, that the defendant was not acting in imperfect self-defense.  If the People have not met this burden, you must find the defendant not guilty of murder.

In rejecting Yem's insufficiency of the evidence claim on direct appeal, the appellate

court concluded:

> [Yem] repeats several times that the only "objective" testimony by "objective" percipient witnesses raises the inference that the group of friends in and around the red Honda engaged in aggressive, gang-related behavior, inciting the confrontation and giving [Yem] good reason to fear for his life.  He discredits the testimony proffered by all six of the young people who witnessed the shooting because they were self-interested gang members or affiliated with Oakland gangs.  By contrast, he argues the employees' testimony, who presumably were "objective" as he sees it, corroborated [Yem's] testimony that members of the group stared at him.  They also testified that they heard gang language from some in the group when they were in the store, that there was loud arguing before the shooting, and that Nhep would not get back in the car.
>
> Certainly, it was the jury's prerogative to accept the defense versions of the confrontation and to infer from his testimony, as well as from that of the liquor store

employees, that [Yem] was in reasonable fear for his life.  But there was compelling evidence he minimizes or ignores to support the jury's contrary conclusion.

Nhep was unarmed.  [Yem] never saw a gun on Nhep or on any of his friends. The jury reasonably could infer they posed no threat to him.  [Yem], on the other hand, had admitted that he was always armed unless he was at work.  The jury could have reasonably found that it was [Yem], an armed and dangerous member of TRG, who either went to the store with the intent to assault the group his gang boss had observed a few minutes earlier or who provoked the confrontation by approaching Nhep, asking him if he had a problem, and pulling the gun on him.  Moreover, [Yem] shot Nhep at close range, although he could have easily walked to his car where his friend Bun sat waiting to drive home.

Because [Yem] testified at trial, the jurors were able to assess his credibility first-hand.  They watched his demeanor, listened to his explanations, and heard the candid story of how he armed himself, shot his victim three times, and then kept on shooting at the car until he ran out of bullets.  They also had the opportunity to evaluate the credibility of the other percipient witnesses based on their testimony, their backgrounds, their motives, and their demeanor.  In other words, the trial was a classic credibility contest and it was the jury's task, not ours, to decide whom to believe.

Finally, the jurors could consider [Yem's] behavior following the shooting.  They may have reasonably concluded that someone who shot in self-defense would not flee the scene, shower to wash off the gun residue, hide his gun, and then lie to the police.  In short, there was more than sufficient evidence that [Yem] shot and killed his victim under circumstances that showed an abandoned and malignant heart to support a second degree murder conviction.  Similarly, there was ample evidence that after [Yem] shot three bullets at Nhep he continued to fire eleven more shots at the red Honda, thus supporting the jury's finding that he fired at an occupied motor vehicle.  [Yem's] challenge to the sufficiency of the evidence is without merit.

Yem argues that the appellate court's decision was unreasonable and contrary to *Jackson* because: 1) Nhep had a knife in his pants and the court therefore misstated the fact that Nhep was unarmed; and 2) "the record contains sufficient conflicting evidence and inconsistencies that would raise a reasonable doubt as to [Yem's] guilt in the mind of any rational juror."  But Yem misperceives the role of a federal court in a habeas proceeding challenging a state-court conviction.  Under *Jackson*, the role of this Court is to simply determine whether there is any evidence, if accepted as credible by the jury, sufficient to sustain conviction.  *See Schlup v. Delo*, 513 U.S. 298, 330 (1995).  In this case, the appellate court determined that there was sufficient

10

evidence that Yem did not believe he was in imminent danger of being killed or suffering great

bodily injury to negate a finding of imperfect self-defense as defined in California and to support

Yem's second degree murder conviction.  Although it might have been possible to draw a

different inference from the evidence, this Court is required to resolve that conflict in favor of

the prosecution.  *See Jackson*, 443 U.S. at 326.  Yem bears the burden of establishing by clear

and convincing evidence that these factual findings were erroneous.  28 U.S.C. § 2254(e)(1).  He

has failed to carry such burden.  The record—including the inconsistencies in testimony and the

fact that Nhep carried a knife—does not compel the conclusion that no rational trier of fact could

have found that Yem did not believe himself to be in danger, especially considering the double

deference owed under *Jackson* and AEDPA.  Yem is therefore not entitled to relief on his legal

insufficiency claim.

    Claim 2.  Confrontation Violation

    Yem next claims that his right to confrontation was violated when the trial court refused

to allow defense counsel to impeach a prosecution witness, Nina F., with a prior juvenile

adjudication for robbery by force or fear.  In considering this claim on direct appeal, the

appellate court recounted the following facts:

> At trial, [Yem] sought to impeach one of the prosecution's witnesses, Nina F.,
> with evidence she had been involved in a robbery when she was 14 years old.  There was
> evidence that Nina F. had been arrested and dispositioned to juvenile hall, but there was
> no evidence about the outcome of the case.  Nina F. was one of the six young people
> gathered at the red Honda in the parking lot of the Discount Liquor Store who observed
> the events surrounding the shooting.  The trial court excluded evidence of the robbery,
> finding the probative value was diminished since the outcome of the case was unknown.
> As a result, the court believed that an examination into Nina F.'s role in the robbery
> would require a minitrial and involve an undue consumption of time.  More importantly,
> the court found the probative value was further diminished by the remoteness of the
> alleged offense.  The witness, who was only 20 years old at the time of trial, had been
> involved in the offense 6 years earlier when she was only 14 years old.

11

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."  U.S. CONST. amend. VI.  It is well settled that, under the Sixth Amendment, an accused has the right to present witnesses, testimony and other evidence in his defense.  *See Washington v. Texas*, 388 U.S. 14, 19 (1967).  However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."  *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).  States have considerable latitude under the Constitution to establish rules excluding evidence from criminal trials.  *Holmes v. S. Carolina*, 547 U.S. 319, 324 (2006).  "Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury.  The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate."  *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) (citations omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion).

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code section 352, permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules.  Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and

12

403 . . . ."  *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009).  California employs a similar rule.  *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

Under these guidelines, this Court cannot find that the trial court's refusal to allow Yem to cross-examine Nina F. with the juvenile offense was an abuse of discretion or unreasonable or contrary to federal law.  As the appellate court concluded:

> We agree with the trial court that a 14 year old's involvement in a robbery would not have produced a significantly different impression of Nina F., who at 20, as [Yem] points out, was wearing gang colors and associating with gang members.  Because the outcome of the juvenile offense was unknown, it was also true that the cross-examination might have consumed an undue amount of time and devolved into a minitrial about an old offense by one of many witnesses who testified to the same basic story line.

Here, Yem had an opportunity to extensively cross-examine Nina F. about any potential biases, inconsistencies, or other infirmities—and did so.  Additionally, the proffered evidence, although relevant, had limited probative value.  It alleged juvenile conduct that had occurred six years prior and the disposition of which was unknown.  Finally, the trial court acted well within its discretion and within the bounds of the Confrontation Clause in determining that the limited probative value of the evidence was outweighed by the undue consumption of time that the presentation of such evidence would require as well as the danger of confusion to the jury.  *See United States v. Scheffer*, 523 U.S. 303, 314 (1998) (noting that "collateral litigation prolongs criminal trials and threatens to distract the jury from its central function of determining guilt or innocence").  The trial court had legitimate concerns that proving up Nina F.'s prior juvenile offense would have resulted in a "minitrial" that would have unduly complicated the matter.

Yem nonetheless contends that the California courts' rejection of his confrontation claim is contrary to *Davis v. Alaska*, 415 U.S. 308 (1974).  In *Davis*, the petitioner had been convicted of grand larceny and burglary following a trial in which the trial judge prevented defense counsel from cross-examining a key witness concerning his adjudication as a juvenile delinquent relating to a burglary and his probation status at the time of the events.  415 U.S. at 309-11.  Defense counsel sought to introduce the witness's juvenile record on cross-examination not as a general impeachment of the witness's character but rather to show bias and prejudice against the defendant because the witness, who was then on probation, might have identified the defendant out of fear or concern that the police might believe he had committed the crime in issue, thereby jeopardizing his probation.  *Davis*, 415 U.S. at 311. Following the affirmance of petitioner's convictions by the Alaska Supreme Court, the United States Supreme Court reversed and remanded, holding that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on the witness's testimony.  *Id.* at 317.  In particular, the court ruled that counsel should have been permitted to ask the witness not only "whether he was biased," but also "why [he] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial."  *Id.* at 318.

The proffered evidence here, however, does not share the probative value of the evidence at issue in *Davis*, and Yem does not claim that he was denied discovery on Nina F.'s juvenile status or otherwise precluded from developing the probative value of the evidence.  Nor was the court in *Davis* required to consider whether the Confrontation Clause is violated when a trial court decides to exclude marginally probative extrinsic impeachment evidence such as that proffered in this case based upon considerations of time and potential juror confusion.  In short,

excluding the proffered evidence here did not violate the Confrontation Clause or any clearly

established Supreme Court authority.  *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986);

*cf. Guasch v. Cates*, No. C 10-5628, 2011 WL 2471029, at *11 (N.D. Cal. June 22, 2011) ("To

have allowed a trial within a trial, that is, a trial of a witness's unrelated and as-yet unproven

credit-card wrong within petitioner's own trial for trying to kill his wife would have been

unwise.  Defense efforts like this are routinely and rightly rejected without doing any damage to

the Sixth Amendment.").  Accordingly, Yem is not entitled to relief on this claim.

Claim 3.  Erroneous Admission

Yem additionally claims that the trial court erred when it admitted over defense objection

the statement that the store clerk made to the police.  Shortly after the shooting, the clerk gave a

statement to the police recounting the incident and giving a detailed description of the shooter.

At trial, the prosecution called the store clerk as a witness.  He testified that he could not recall

many of the details of the incident, including the details of his earlier description of the

altercation which suggested that Yem was the aggressor, and that he did not see what the suspect

looked like and denied ever seeing an actual gun.  He repeatedly stated that the passage of time

affected his memory of the incident.  Over defense objection, the trial court determined that the

clerk's lack of memory was feigned and thus admitted the clerk's earlier recorded statement to

the police as a prior inconsistent statement under California Evidence Code §§ 770[1] and 1235.[2]

---

[1]         Section 770 provides:

> Unless the interests of justice otherwise require, extrinsic evidence of a
> statement made by a witness that is inconsistent with any part of his testimony at
> the hearing shall be excluded unless:
>> (a) The witness was so examined while testifying as to give him an
>> opportunity to explain or deny the statement; or

Under California law, a witness's prior statement that is inconsistent with his or her testimony is admissible so long as the witness is given the opportunity to explain or deny the statement.  CAL. EVID. CODE §§ 770, 1235; *People v. Coffman*, 96 P.3d 30, 90 (Cal. 2004).  A prior inconsistent statement is admissible not only to impeach a witness's credibility but also to prove the truth of the matter asserted therein.  CAL. EVID. CODE § 1235; *California v. Green*, 399 U.S. 149, 164 n.15 (1970).  To the extent that Yem asserts an error under California evidentiary law, such claim is not cognizable on federal habeas review.  The Supreme Court has made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  In this context, the Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly, limiting them to specific guarantees enumerated in the bill of rights.  *Estelle*, 502 U.S. at 73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

"The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).  "Although the Court has been clear that a writ should be issued when constitutional errors have

---

(b) The witness has not been excused from giving further testimony in the action.

CAL. EVID. CODE § 770.

[2]     Section 1235 provides that "[e]vidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."  CAL. EVID. CODE § 1235.

rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of

irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant

issuance of the writ." *Id.* (citing *Williams*, 529 U.S. at 375).  The Supreme Court has never held

that a prior inconsistent statement may not be admitted to impeach a witness.  Absent such

"clearly established Federal law," it cannot be concluded that the appellate court's ruling was an

"unreasonable application."  *Carey*, 549 U.S. at 77 (noting that, where the Supreme Court has

not adequately addressed a claim, a federal court cannot find a state court ruling unreasonable).

Moreover, a defendant's Sixth Amendment right to confront and cross-examine a witness is not

violated when the witness who made the prior inconsistent statement is available for

cross-examination, even when that witness claims not to remember making the prior statement,

*Crawford v. Washington*, 541 U.S. 36, 59-60, n.9 (2004).  Thus, Yem makes no showing that the

admission of the clerk's statement rose to the level of a constitutional violation.  Although

he alleges a violation of the Constitution, his broad assertion is insufficient to raise an issue of

constitutional dimension.  *See Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (a

petitioner cannot transform a state-law issue into a federal one by simply asserting a due process

violation).  Yem's claim is premised on the interpretation of state law.  It is therefore not

cognizable on federal habeas review and must be rejected here.  *Estelle*, 502 U.S. at 67.

Claim 4.  *Batson* Violation

Finally, Yem argues that he was prejudiced by the prosecutor's use of a peremptory

challenge to remove the only African American from the jury panel solely based on racial bias.

On direct appeal, the appellate court summarized the following facts underlying this claim:

> The prosecutor exercised her second peremptory challenge to excuse an African-American juror with an attitude and background [Yem] characterized as favorable to the prosecution: his mother was a police officer, he was a Marine with training as a Navy Seal and an Army Ranger, and his son served in the Army.  He was familiar with gangs and adolescent behavior but, he explained, did not judge people based on stereotypes and realized that young people who participated in gangs could turn out to be good citizens or they could go astray and take a toll on a neighborhood.  He had been to the Discount Liquor Store where the shooting occurred many times.  The trial court found these circumstances did not give rise to a reasonable inference that the prospective juror had been challenged because of impermissible group bias.
> . . . .
> The trial court realized that the exclusion of even one juror based on race violated [Yem's] rights under the state and federal Constitutions.  In this case, however, the court explained that [Yem] did not carry his burden of establishing a prima facie case of discrimination.  The court stated: "Now, the Court is looking at the totality of the circumstances in this case, understanding that [Prospective Juror B.] is African-American.  But all the principles in this case are Cambodian, [Yem] and the victim, so there's no group association.  [¶]  The case doesn't have group overtones in the sense that it's a minority group versus victims from the dominant part of our culture, so there's not a factor that establishes prima facie showing.  There hasn't been a pattern, although it's not required.  It is a factor to be considered.  [¶]  That is not the case at this point in time, nor can I say anything about disproportionate use of challenges.  I will not.  He was not the first person the prosecution challenged.  He was the second person the prosecution challenged.  [¶]  The questions that were asked by the prosecution were not derogatory, they were probative.  They were probing.  And it wasn't as if there wasn't—there was no intent to get any information from him."

The Equal Protection Clause prohibits purposeful racial discrimination in the selection of

the jury.  *Batson v. Kentucky*, 476 U.S. 79, 86 (1986).  On federal habeas review, AEDPA

"imposes a highly deferential standard for evaluating state-court rulings" regarding *Batson*

claims that "demands that state-court decisions be given the benefit of the doubt."  *Felkner v.*

*Jackson*, 131 S. Ct. 1305, 1307 (2011) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).  This

"standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that the trial court's credibility determination was supported by substantial evidence, we must uphold it." *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012).

In *Batson*, the Supreme Court outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause: 1) a defendant raising a *Batson* claim must establish a *prima facie* case of discrimination; 2) once a *prima facie* case of discrimination is established, the burden of offering race-neutral reasons for the strikes shifts to the prosecutor; 3) after the prosecutor offers race-neutral reasons, the trial court has the duty to determine if the defendant has established purposeful discrimination. *Paulino v. Harrison*, 542 F.3d 692, 699 (9th Cir. 2008) (citing *Batson*, 476 U.S. at 98).  Because the trial court found that Yem failed to establish a *prima facie* case of discrimination, only that issue is before this Court.

To establish a *prima facie* case of discrimination under *Batson*'s first step, the defendant must show that: 1) the prospective juror is a member of a cognizable racial group; 2) the prosecutor used a peremptory strike to remove the juror; and 3) the totality of the circumstances raises an inference that the strike was on account of race.  *Batson*, 476 U.S. at 96; *Crittenden v. Ayers*, 624 F.3d 943, 955 (9th Cir. 2010).  The prosecutor's use of a peremptory strike to remove the African American juror satisfies the first two prongs of the inquiry; the question here is therefore whether the totality of the circumstances raises an inference that the strike was used on account of race.  A defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.  *Johnson v. California*, 545 U.S. 162, 170 (2005).

Reviewing the totality of circumstances does not raise an inference that discrimination has occurred.  In this case, Yem, who is Cambodian, is a different race than the challenged juror. The Supreme Court has held that criminal defendants may object to race-based peremptory challenges of jurors regardless of whether the defendant and the excluded juror are of the same race.  *Powers v. Ohio*, 499 U.S. 400, 415-16 (1991).  In so doing, however, the Court noted that it may be difficult to make a *prima facie* showing when the potential juror and the defendant are of different races.  *Id.* at 416.  As the trial court noted when examining the totality of circumstances in this case:

> [A]ll the principles in this case are Cambodian, [Yem] and the victim, so there's no group association.
> The case doesn't have group overtones in the sense that it's a minority group versus victims from the dominant part of our culture, so [that's] not a factor that establishes prima facie showing.

As the trial court further recognized, the record does not indicate that the prosecutor used the challenges disproportionately, and the prosecution asked the potential juror during voir dire questions that were "probative" and "probing."

While it may give this Court pause that the prosecutor declined to provide reasons for her use of a peremptory challenge, unless the trial court finds a *prima facie* showing of discrimination, *Batson* does not require the party exercising the peremptory challenge to provide race-neutral reasons.  *J.E.B. v. Alabama*, 511 U.S. 127, 144-45 (1994); *Batson*, 476 U.S. at 97; *United States v. Collins*, 551 F.3d 914, 927 (9th Cir. 2009) (Graber, C.J., concurring) ("[I]f no prima facie case of discrimination has been made, a prosecutor is not required to give any explanation.").

In *Collins*, the Ninth Circuit was faced with a similar case in which the sole question was whether the totality of the circumstances raised an inference of discrimination as to satisfy *Batson*'s *prima facie* test. 511 F.3d at 920. In that case, there was a lack of diversity on the venire panel such that no pattern of discrimination could be made, and the prosecutor declined to provide race-neutral reasons after the district court found no *prima facie* case of discrimination. *Id.* at 919-20. In appealing the district court's finding, the defendant compared certain qualities of the seated jurors to the struck juror—just as Yem has done in his Petition. *Id.* at 921-22. Relying on the comparative analysis, the *Collins* court concluded that the defendant established a *prima facie* case of discrimination. *Id*. at 922-23.

*Collins* is distinguishable here, however, largely because the Ninth Circuit employed *de novo* review after determining that the district court applied the wrong legal standard. *Id.* at 919 (citing *Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004) (concluding that the state court applied the wrong legal standard by requiring defendant to "show a strong likelihood" of bias)). Here, however, the trial court correctly stated that "the standard is reasonable inference of group bias," and the appellate court quoted *Batson*, 476 U.S. at 93-94, in stating that "[a] criminal defendant must establish a *prima facie* case of discrimination 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" Accordingly, this Court must defer to the state court's factual finding that there was no *prima facie* showing of bias. *See Tolbert v. Page*, 182 F.3d 677, 682 (9th Cir. 1999) (en banc); *see also Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012). Moreover, the Ninth Circuit concluded in *Collins* that "comparative juror analysis does not reveal any meaningful distinctions between [the struck juror] and other panel members who were retained by the government." *Collins*, 551 F.3d at

21

922.  In this case, a review of the totality of the circumstances demonstrates plausible race-neutral reasons for the prosecution's challenge.  As the appellate court reasoned:

> [Yem] suggests that Prospective Juror B. had the markings of a juror favorable to the prosecution because of his familial association with the military.  The Attorney General points out that in a case such as this, where the prosecutor needed jurors who would not discredit the testimony of important percipient witnesses due to their affiliation with gangs, the prosecutor would be looking for jurors more typically friendly to the defense.  Either way, we do not find that the juror's connections to law enforcement alone give rise to a reasonable inference that the prosecutor's motives are discriminatory.
> Moreover, Prospective Juror B. was a patron of the store where the shooting occurred, as was [Yem].  The prosecutor might have wanted to avoid the possibility of any personal connections the juror could have had with the owners, clerks, or [Yem] himself.  Such a connection might be speculative, but it would be enough to dispel a discriminatory motive.  It is important to note, however, that the prosecutor was not obligated to demonstrate a nondiscriminatory basis for her challenges because [Yem] failed to meet his threshold burden to demonstrate a prima facie showing of group bias.  We agree with the trial court that the record is simply devoid of any evidence from which to draw a reasonable inference of discrimination.

In sum, given the deference afforded to the trial court's finding, this Court must conclude that the trial court did not err in finding that Yem failed to establish a *prima facie* showing of discrimination, and Yem is not entitled to relief on this ground.  *See Foggy v. Valenzuela*, No. 12-CV-2633, 2014 WL 1333671, at *6 (S.D. Cal. Apr. 2, 2014).

## V. CONCLUSION AND ORDER

Yem is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the

issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: May 2, 2014.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge

23